**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4320-17T1

STEPHEN W. THOMPSON,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES, JUDICIAL
RETIREMENT SYSTEM,

     Respondent-Respondent.

_____

Argued April 30, 2019 – Decided June 3, 2019

Before Judges Geiger and Enright.

On appeal from the Board of Trustees of the Judicial Retirement System, Department of the Treasury, Docket No. 6-614.

Brian A. Pelloni argued the cause for appellant (Hornstine & Pelloni, LLC, attorneys; Brian A. Pelloni, on the briefs).

Robert S. Garrison, Jr., Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Robert S. Garrison, Jr., on the brief).

PER CURIAM

Petitioner Stephen W. Thompson appeals from a final decision of the State House Commission, sitting as the Board of Trustees (Board) for the Judicial Retirement System (JRS), to forfeit his entire JRS account as dishonorable. We affirm.

I.

The following facts are not in dispute. Following his graduation from college, Thompson voluntarily enlisted in the Army. He commenced service in January 1968, and graduated from Officer Candidate School in November 1968, as a second lieutenant. He was deployed to Vietnam on July 4, 1969, as an infantry platoon leader.

Thompson's platoon was immediately and continuously engaged in direct combat. On July 29, 1969, Thompson was gravely injured; he sustained twenty rounds of automatic fire at point-blank range, resulting in the loss of his right leg, bladder, penis, testicles, and seven inches of height.

Thompson endured a lengthy and complicated recovery, spending months in intensive care at a hospital in Japan, where he repeatedly came close to death and suffered serious complications. He was subsequently transferred to Walter

A-4320-17T1

Reed Army Medical Center, where he spent over two years undergoing multiple surgeries during his recovery and rehabilitation.

Thompson was awarded a Silver Star for gallantry in action, a Purple Heart decoration for being wounded in action, and a Vietnam Service Medal. He was honorably discharged in May 1972.

Thompson then attended and graduated from law school and was admitted to the Bar of New Jersey in December 1975. His public service began in 1979, when he was appointed Haddon Township municipal prosecutor. Thompson was appointed as the Township's municipal court judge the following year.

Thereafter, Thompson served as an Administrative Law Judge (ALJ) from 1984 until he was appointed to the Superior Court Judge on July 7, 1989. He served in that capacity until April 30, 2003, when he was arrested and suspended without pay from his judicial duties. Thompson's arrest and suspension stemmed from an investigation relating to child pornography, which led to the issuance and execution of search warrants on his homes in Avalon and Haddon Township.

The search of the Avalon residence yielded thousands of images of child pornography in both electronic and print form; it also uncovered films of child pornography in digital, videocassette, and 8mm format. At Thompson's Haddon

Township residence, investigators seized a videotape containing images of a prepubescent male child masturbating and being anally penetrated, and a computer containing numerous images of child pornography. The videocassette seized from Thompson's video camera depicted a young male engaging in sexually explicit conduct at Thompson's direction. The footage also captured Thompson performing fellatio on the child. The forty-minute long videotape was recorded during Thompson's five-day trip to St. Petersburg, Russia in September 2002.

On May 21, 2003, Thompson submitted his retirement application as a Superior Court Judge. Thompson sought to make his retirement effective April 30, 2003. Upon receipt of the letter, the Board treated the early retirement application as being effective June 1, 2003. At that point, Thompson had accrued judicial service of thirteen years and ten months and non-judicial service of thirteen years. If awarded retirement for his total service, Thompson would have received $51,916.19 annually, based on 36.82 percent of his final annual salary of $141,000. The Board voted to hold Thompson's retirement application in abeyance until his criminal charges were resolved.[1]

---

[1] "N.J.S.A. 43:2-1 expressly provides that pension payments to public employees convicted of crimes involving moral turpitude shall be suspended

The State's charges were superseded by a federal indictment, which charged Thompson with knowingly and willfully possessing child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (2); and knowingly and willfully employing, using, inducing, enticing, or coercing a minor to engage in sexually explicit conduct, for the purpose of producing a visual depiction of such conduct, which was transported in interstate and foreign commerce, in violation of 18 U.S.C. § 2251(a) and (d), and (2). The criminal complaint alleged Thompson possessed child pornography "[o]n or about April 30, 2003, at Avalon," and undertook actions to engage a minor in sexually explicit conduct "[f]rom on or about September 20, 2002, through on or about April 30, 2003, at Avalon."

Thompson pleaded not guilty and asserted an insanity defense.[2] "[T]he core of Thompson's insanity defense . . . was that he did not understand the moral wrongfulness of his actions." United States v. Thompson, 310 Fed. App'x 485, 486 (3d Cir. 2008). Tried to a jury in federal District Court, Thompson

_____

during the period of confinement." Eyers v. Pub. Emps.' Ret., 91 N.J. 51, 57 (1982); see also N.J.A.C. 17:1-6.1(d).

[2] Thompson's insanity defense was predicated on post-traumatic stress disorder and the trauma caused by his combat injuries.

was found guilty of sexual exploitation of a minor and not guilty by reason of insanity of possession of child pornography.[3] Thompson was sentenced to the ten-year mandatory minimum prison term,[4] followed by a three-year term of supervised release. He was ordered to pay a $25,000 fine and to register as a sex offender with State authorities. The Third Circuit Court of Appeals affirmed Thompson's conviction. Ibid.

Attorney ethics charges were also levied against Thompson. The Office of Attorney Ethics (OAE) recommended disbarment based on Thompson's criminal conviction. The charges were then considered by the Disciplinary Review Board (DRB) pursuant to Rule 1:20-13(c)(2). The DRB agreed with the OAE's recommendation. In its decision filed with the Supreme Court pursuant to Rule 1:20-13(c), the DRB recommended that Thompson be disbarred based on his conviction for the sexual exploitation of a minor in violation of 18 U.S.C. § 2251A(a) and (2), conduct that violated RPC 8.4(b) (commission of a criminal

---

[3] The transcripts of the trial testimony and reports issued by Thompson's experts were not part of the record before the Board, and are not part of the record on appeal.

[4] Notably, the mandatory minimum sentence for violation of 18 U.S.C. § 2251(a) was raised to fifteen years in April 2003. Thompson, 310 Fed. App'x at 485 n.1.

act that reflects adversely on his honesty, trustworthiness or fitness as a lawyer).[5]

Disciplinary Review Bd. v. Thompson, DRB 08-059, final decision, (Oct. 21, 2008), http://njlaw.rutgers.edu/collections/drb/decisions/08-059.pdf; In re Thompson, 197 N.J. 464, 464 (2009). The Supreme Court adopted the DRB's recommendation, disbarring Thompson effective January 29, 2009. Thompson, 197 N.J. at 464.

Thompson was released from incarceration on June 11, 2014; he renewed his retirement benefits application six months later. The Board rendered a decision to forfeit Thompson's "entire JRS service and salary credit as dishonorable." The Board determined that Thompson's actions "constituted a high degree of moral turpitude," and "violated the public trust." The Board concluded "[t]he misconduct was ongoing and resulted in the suspension of [his] judgeship." It noted Thompson admitted his "conduct was deplorable." The

---

[5] The DRB's decision was not part of the record submitted to the Board or the ALJ, and was not listed on the Statement of the Items Comprising the Record. R. 2:5-4(b). The Board did not move to supplement the administrative record pursuant to Rule 2:5-5(b). See Rudbart v. Bd. of Review, 339 N.J. Super. 118, 123 (App. Div. 2001) (R. 2:5-5(b) "contemplates the filing of a formal motion seeking that relief, in advance of oral argument"). The DRB's decision was not published. See R. 1:20-15(a) (DRB decisions are published "only if so directed by the Supreme Court or if approved for publication by the Committee on Disciplinary Decisions"). We, nonetheless, take judicial notice of the DRB's decision, which is a public document issued by a board whose members are appointed by the Supreme Court. N.J.R.E. 201(a); N.J.R.E. 202(b); R. 1:20-15.

Board found Thompson's misconduct was "egregious" and "severely discredited the judiciary system."

Thompson challenged the forfeiture, and the matter was then transmitted to the Office of Administrative Law for hearing as a contested case. Both parties agreed to submit the matter for summary decision pursuant to N.J.A.C. 1:1-12.5. The ALJ concluded the gravity of Thompson's misconduct warranted total forfeiture. The ALJ's initial decision was not modified by the Board. As a result, it was adopted as the Board's final decision by operation of law. N.J.S.A. 52:14B-10(c). This appeal followed.

Thompson argues:

> I. THE STATE HOUSE COMMISSION IMPROPERLY FORFEITED APPELLANT'S ENTIRE [TWENTY-SIX PLUS] YEARS OF PENSION CREDIT BASED UPON HIS CONVICTION FOR AN OFFENSE THAT OCCURRED ONLY MONTHS BEFORE HIS RETIREMENT.
>
> > A. Where a Pension Forfeiture is Appropriate Based Upon a Criminal Conviction, the Proper Measure of Forfeiture is the Credited Time Between the Offense and Retirement/Removal.
> >
> > B. The State House Commission Failed to Properly Consider and Balance the Factors Necessary to Support Total Forfeiture.

C. Pension Statutes are to be Liberally Construed, and Any Doubt About Complete Forfeiture of an Employee's Pension Credit Must be Resolved in Favor of the Employee.

II.

Appellate courts serve a "limited role" in reviewing administrative agency decisions. In re Stallworth, 208 N.J. 182, 194 (2011) (quoting Henry v. Rahway State Prison, 81 N.J. 571, 579 (1980)). We will not overturn an agency decision "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Stein v. Dep't of Law & Pub. Safety, 458 N.J. Super. 91, 99 (App. Div. 2019) (quoting J.B. v. N.J. State Parole Bd., 229 N.J. 21, 43 (2017)). Nor will we overturn an agency decision merely because we would have come to a different conclusion. Stallworth, 208 N.J. at 194. "Generally, courts afford substantial deference to an agency's interpretation of a statute that the agency is charged with enforcing. An appellate court, however, is 'in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue.'" Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 196 (2007) (quoting In re Taylor, 158 N.J. 644, 658 (1999)).

A public employee must provide "honorable service" to receive pension or retirement benefits. N.J.S.A. 43:1-3(a); N.J.A.C. 17:1-6.1(a); see also Corvelli v. Bd. of Trs., 130 N.J. 539, 550 (1992) (noting all of New Jersey's public pension statutes have an implied requirement of honorable service, and forfeiture can be ordered for employees who violate that requirement). The Board is authorized to order forfeiture, in whole or in part, "for misconduct occurring during the member's public service which renders the member's service or part thereof dishonorable." N.J.S.A. 43:1-3(b); N.J.A.C. 17:1-6.1(a), (c). Ordinarily, to require forfeiture of that portion of a member's pension that accrued prior to the criminal activity, the Board must find that the misconduct was related to the member's service. Masse v. Bd. of Trs., 87 N.J. 252, 263 (1981). Nevertheless, forfeiture is not limited to misconduct resulting in a criminal conviction. Corvelli, 130 N.J. at 552. Rather, "the term 'honorable service' . . . is sufficiently generic to encompass a broad range of misconduct bearing on the forfeiture decision, including but not limited to criminal conviction." Ibid.

In Uricoli v. Board of Trustees, the Court set forth eleven factors to balance and consider in pension forfeiture cases. 91 N.J. 62, 77-78 (1982).

Since 1996, those factors have been codified at N.J.S.A. 43:1-3(c), which

provides:

> In evaluating a member's misconduct to determine whether it constitutes a breach of the condition that public service be honorable and whether forfeiture or partial forfeiture of . . . earned pension . . . benefits is appropriate, the [Board] shall consider and balance the following factors in view of the goals to be achieved under the pension laws:
>
> (1) the member's length of service;
>
> (2) the basis for retirement;
>
> (3) the extent to which the member's pension has vested;
>
> (4) the duties of the particular member;
>
> (5) the member's public employment history and record covered under the retirement system;
>
> (6) any other public employment or service;
>
> (7) the nature of the misconduct or crime, including the gravity or substantiality of the offense, whether it was a single or multiple offense and whether it was continuing or isolated;
>
> (8) the relationship between the misconduct and the member's public duties;
>
> (9) the quality of moral turpitude or the degree of guilt or culpability, including the member's motives and reasons, personal gain and similar considerations;

(10) the availability and adequacy of other penal sanctions; and

(11) other personal circumstances relating to the member which bear upon the justness of forfeiture.

[Ibid.]

The Board may attribute more weight to factors seven, eight, and nine, when applicable. Corvelli, 130 N.J. at 552-53 (holding total pension forfeiture "was justified by application of Uricoli factors seven, eight, and nine").

IV.

Thompson contends the Board failed to provide an explanation of its findings and analysis of the eleven enumerated factors under N.J.S.A. 43:1-3(c). He asserts that failure warrants reversal of its final decision. We disagree.

Recognizing that the eleven statutory factors "must be considered and balanced to determine the appropriateness of a forfeiture or partial forfeiture," the ALJ engaged in the following analysis:

> In applying the balancing test in N.J.S.A. 43:1-3(c), it is factors 7, 8, and 9 that weigh heavily in favor of total forfeiture. I concur with the Board that with respect to factor 7, the offenses were continuing and not isolated, and the crimes committed were grave. With respect to factor 8, the relationship between the misconduct and the petitioner's public duties was direct, and a judge is held to a high degree of responsibility to respect and uphold the laws. With respect to factor 9, the guilty verdict as to 18 U.S.C. §

2251(a), sexual exploitation of a minor, demonstrates a high degree of culpability and moral turpitude, and petitioner's actions were egregious and constituted a violation of the public trust. Petitioner's misconduct severely discredited the judiciary system.

With respect to factor 11, the other personal circumstances that bear upon the justness of forfeiture involve petitioner's service in the United States Army and his grievous injuries. Further, he served the public as a municipal prosecutor, a municipal court judge, an administrative law judge, and a judge of the Superior Court. During that time, petitioner was never the subject of any disciplinary action.

I **CONCLUDE** that petitioner's personal circumstances considered with respect to factor 11 do not outweigh the overwhelming negatives set forth above with respect to factors 7, 8, and 9. Therefore, I **CONCLUDE** that petitioner's entire Judicial Retirement System service and salary should be forfeited as dishonorable.

The ALJ also relied on language from Uricoli, where the Court noted pension forfeiture "is a penalty or a punishment for wrongful conduct" and, therefore, "[a]ll elements of doubt must be resolved in favor of the person against whom the forfeiture is sought." Uricoli, 91 N.J. at 76. Nevertheless, the ALJ found total forfeiture was appropriate, and the Board adopted the ALJ's decision.

An administrative agency must provide an adequate explanation of its decision. In re Issuance of Permit by Dep't of Envtl. Prot., 120 N.J. 164, 173 (1990). Here, the Board did so by adoption. N.J.S.A. 52:14B-10(c) (stating the

13

ALJ's decision shall be deemed adopted as the final decision of the head of the agency unless the agency chooses to reject or modify the decision within forty-five days of receipt).  Because the Board adopted the ALJ's findings of fact and conclusions of law in their entirety, it was not statutorily required to amplify those findings, which included an analysis of all the factors.

Thompson was found not guilty of possession of child pornography by reason of insanity; thus, the jury must have concluded Thompson actually possessed the illicit materials.  Otherwise, he would simply have been found not guilty.  Contrary to Thompson's contention, such conduct was not a single isolated incident or act.  Rather, it involved acquisition of thousands of images of child pornography and the use of a pay service to hide his web browsing activities.  Thompson used a judiciary-issued laptop to acquire and store the pornographic images of children and to arrange his encounter in Russia.

Thompson further argues too much weight was applied to factor eight since the sexual exploitation of a minor took place in a foreign country, his position as a judge played no role in facilitating the crime, and the crime never affected his ability to perform his job properly.  We are unpersuaded by these arguments.

Thompson's misconduct related to and touched upon his office because he used a judiciary-supplied laptop to engage in his criminality. Thompson used the laptop to orchestrate his fateful trip to Russia. He also stored images of child pornography on the laptop. As noted by the DRB:

> Law enforcement officers also obtained the consent of Thompson's employer to search the laptop computer that had been issued to him for use in his judicial chambers. Thompson used this computer to arrange . . . for his sexual escapade in Russia. Thompson also accessed thousands of pictures of child pornography from this laptop computer. In total, Thompson had in excess of 6,000 images of child pornography in his possession.

> Analysis of the computer, as well as Thompson's credit card records, revealed that Thompson, while trolling the internet for child pornography, used certain websites and software designed to cover his tracks. For example, Thompson used a website called Anonymizer.com, which is a pay service that allows the user to visit other websites without revealing his internet protocol address. Thompson used this service over 6,000 times when visiting various internet news groups specializing in child pornography . . . .

[Thompson, DRB 08-059 at *6-7.]

Put simply, the laptop was an essential instrument in his crimes. Knowing that such use was illegal and violated workplace policy, he employed a service to anonymize his internet browsing history over 6000 times. His criminality was thus linked to his judicial position.

Thompson's misconduct was not confined to the last two years of his judicial service. On the contrary, although the possession of child pornography charge related to a single date, April 30, 2003, it is clear that Thompson began accumulating images of child pornography "in the early 1970's." Id. at *10. He confined his illegal conduct to acquiring and viewing images of child pornography "until the late 1990's." Ibid. His conduct grew even worse thereafter. While Thompson attributes his misconduct to a traumatic brain injury, "respondent knew that what was he was doing was wrong. Although he suffers from PTSD, he is not psychotic and, according to [his own expert,] Dr. DiGiacomo, 'is aware of what he is doing.'"[6] Id. at *16. This awareness is exemplified by his sophisticated efforts to conceal his computer-based misconduct.

We are mindful that judges are held to a higher standard of conduct than other citizens. Canon 1, Rule 1.1 of the Code of Judicial Conduct "compels a judge to maintain high standards of conduct that preserve the integrity and independence of the Judiciary." In re DiLeo, 216 N.J. 449, 471-72 (2014); see

---

[6] These conclusions were echoed by Dr. White, who opined Thompson's "intellectual levels remained intact" and "[t]he frontal lobes of [his] brain, responsible for judgment and decision-making, were functioning properly." Dr. White also concluded Thompson showed no signs of psychopathology or executive dysfunction.

also In re Advisory Letter No. 3-11, 215 N.J. 495, 503 (2013) (discussing generally the "necessarily high" standard of judicial conduct). Canon 1, Rule 1.2 requires judges to respect and comply with the law. "Canon 5 requires judges to conduct extrajudicial activities in a manner to avoid . . . 'demeaning the judicial office' . . . ." Advisory Letter No. 3-11, 215 N.J. at 504.

Thompson argues the Board did not adequately consider and balance his psychiatric conditions in determining that total forfeiture was appropriate. We disagree. Thompson was convicted by a jury of the sexual exploitation of a minor, a crime now punishable by a fifteen-year mandatory minimum sentence. He served a ten-year prison term and three years of supervised release, paid a $25,000 fine, and is registered as a sex offender as a result of his conduct. He was also disbarred. We have little doubt he would have been removed from judicial office had he not retired. Thompson seemingly recognized this in his retirement letter.

The criminal conviction, which was affirmed on appeal, conclusively establishes his misconduct. Indeed, Thompson does not deny committing the offense, which was meticulously planned and preserved on videotape for future use. By any standard, his conduct was egregious. Thompson himself described his conduct as deplorable.

Thompson's misconduct was by no means victimless. "[C]hild pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years." Child Pornography Prevention Act of 1996, Pub. L. 104-208, § 121, 110 Stat. 3009-26, reprinted in 18 U.S.C. § 2251 note at 611. The actions undertaken to produce child pornography subject the children involved to conduct no child should endure, and the impact on the victims is profound and lasting. See United States v. Goff, 501 F.3d 250, 259 (3d Cir. 2007) ("Their injuries and the taking of their innocence are all too real. There is nothing 'casual' or theoretical about the scars they will bear from being abused . . . ."). The children are then revictimized by the distribution and possession of the images depicting their abuse. See Ashcroft v. Free Speech Coal., 535 U.S. 234, 249 (2002) (noting "as a permanent record of a child's abuse, the continued circulation itself would harm the child"); see also Goff, 501 F.3d at 259 ("The simple fact that the images have been disseminated perpetuates the abuse initiated by the producer of the materials."). Furthermore, "the consumer of child pornography 'creates a market' for the abuse by providing an economic motive for creating and distributing the materials." Goff, 501 F.3d at 260.

Thompson's misconduct tarnished the image and integrity of the judiciary of this State. See DiLeo, 216 N.J. at 471 ("Consideration of the public's perception of the judiciary . . . lies at the core of the Code of Judicial Conduct."). The vileness, depravity, moral turpitude, and gravity of Thompson's misconduct is obvious. The sustained nature of his misconduct over several decades renders his entire judicial service dishonorable.

Given our deferential standard of review and the nature of Thompson's misconduct, we have little difficulty in upholding the Board's decision to totally forfeit his judicial retirement benefits. The decision is supported by substantial evidence in the record and is neither arbitrary, capricious, nor unreasonable.

Thompson's remaining arguments lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4320-17T1